# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CEDAR RAPIDS DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

RONALD TITLBACH,

        Defendant.

No. CR00-0025

**REPORT AND RECOMMENDATION**

_____

This matter comes before the court pursuant to the defendant's motion pursuant to 28 U.S.C. § 2255 (docket number 313) and his request for an evidentiary hearing (docket number 371).  This matter was referred to the undersigned United States Magistrate for issuance of a report and recommendation.  It is recommended that the motion and request for an evidentiary hearing be denied.

## PROCEDURAL HISTORY

Defendant Titlbach was first indicted on May 11, 1999, in case CR99-0037.  He was charged with one count of distributing 12.16 grams of methamphetamine on April 6, 1999, to confidential informant Lloyd Cinkan at the Sun Mart grocery store on Mount Vernon Road, SE, in Cedar Rapids, Iowa.  It was further alleged that this distribution took place within 1,000 feet of a schoolhouse.  The case was ultimately set for trial in October 1999.  On the eve of trial, the case was dismissed without prejudice due to the government's inability to find a critical witness, the informant Lloyd Cinkan.

The defendant was again indicted on April 13, 2000 in case CR00-0025.  The defendant, Susan Titlbach, and Joseph Anderson were charged with a conspiracy to manufacture and distribute 50 grams or more of methamphetamine between 1998 and April 2000.  Joseph Anderson was charged alone in Count 2.  Count 3 charged the same distribution of methamphetamine against defendant Titlbach as was earlier charged in case

1

CR99-0037. Finally, the defendant and Joseph Anderson were charged in Count 4 with obstruction of justice or witness tampering relating to the government's inability to find Lloyd Cinkan for the October 19, 1999, trial in case CR99-0037.

Case CR00-0025 went to trial on February 27, 2001. Only the defendant and Susan Titlbach were tried because Joseph Anderson had committed suicide in December 2000. The jury found the defendant guilty of a conspiracy to distribute and manufacture more than 50 grams of methamphetamine, guilty of the April 1999 distribution to Lloyd Cinkan and not guilty of witness tampering.

The defendant was sentenced on December 19, 2002. The defendant had two prior felony drug convictions. The jury specifically found that the conspiracy charged in Count 1 extended beyond the date that his last felony conviction became final. Therefore, the defendant was sentenced to a term of life imprisonment without the possibility for parole on Count 1. He received a 960-month term of incarceration on Count 3 to be served concurrently.

On appeal, the defendant challenged the sufficiency of the evidence within respect to the finding that he distributed more than 50 grams of methamphetamine and whether his involvement in the conspiracy continued after the date his prior conviction became final. The defendant further challenged admission of evidence found in his coconspirators' residence. He claimed that his statutory and constitutional rights to a speedy trial were violated. The Eighth Circuit Court of Appeals affirmed the defendant's conviction in all respects. The sentence of 960 months' incarceration on Count 3 was reversed and the defendant was sentenced to a 720-month term of incarceration on Count 3 on remand (docket number 295).

The defendant brings this motion pursuant to 28 U.S.C. § 2255 alleging ineffective assistance of counsel against each of the four attorneys who represented him in cases CR99-0037 and CR00-0025. He also makes claims of prosecutorial misconduct.

## FACTS

The Eighth Circuit Court of Appeals succinctly described the facts of this case as follows:

> After responding to a suspicious house fire on May 5, 1998, in Waterloo, Iowa, law enforcement discovered a methamphetamine laboratory (Kroeger lab). Titlbach was at the Kroeger lab during the fire, but fled before emergency personnel arrived. Titlbach supplied Donald Kroeger (Kroeger) with stolen anhydrous ammonia in exchange for methamphetamine. Some time before the fire, Kroeger taught Titlbach and Jack Bruce (Bruce) how to manufacture methamphetamine using the anhydrous reduction method.

> In March 1999, law enforcement executed a search warrant at Robert Symonds's (Symonds) home, finding a methamphetamine laboratory in a garage (Symonds lab). Titlbach used the Symonds lab in exchange for methamphetamine. Symonds watched Titlbach manufacture methamphetamine on five occasions, but knew Titlbach used the lab on other occasions because of the debris and methamphetamine left there. Titlbach manufactured methamphetamine in the Symonds lab on approximately ten occasions making one to one-and-a-half ounces each batch.

> On April 6, 1999, law enforcement, with the assistance of Lloyd Cinkan (Cinkan, conducted a controlled purchase from Titlbach of 12.61 grams of a mixture containing methamphetamine. Cinkan purchased the methamphetamine at a Sun-Mart grocery store located less than 500 feet from an elementary school.

> On May 31, 2000, Titlbach and Lenora Shipp (Shipp) were arrested after law enforcement discovered drug-related paraphernalia in their vehicles. Officers were conducting a routine inspection of vehicles in a hotel parking lot when they noticed Shipp's vehicle had local license plates. A check determined Shipp had an outstanding warrant. Shipp had rented a room in cash under an alias. A one point, law enforcement answered Shipp's cellular telephone and the caller identified himself as "Ron." While searching Shipp's vehicle,

officers noticed another suspicious vehicle and followed it. Titlbach was driving the second vehicle, but when stopped he initially gave the name of Billy Shipp.

United States v. Titlbach, 339 F.3d 692, 695 (8th Cir. 2003).

## Standards For Proceedings Under 28 U.S.C. § 2255

Title 28 U.S.C. § 2255 states in pertinent part:

> A prisoner under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255. Section 2255 is the statutory analogue of habeas corpus for persons in federal custody. Poor Thunder v. United States, 810 F.2d 817, 821 (8th Cir. 1987). "Like habeas itself, Section 2255 is not the equivalent of a direct appeal. There are many claims of error sufficiently grave and prejudicial to cause a reversal of conviction on direct appeal, but yet not fundamental enough to support a collateral attack" under section 2255. Id. at 821. Consequently, relief under section 2255 is reserved solely for "transgressions of constitutional rights and for a narrow range of injuries that could not have been raised on direct appeal and, if [left] uncorrected, would result in a complete miscarriage of justice." United States v. Apfel, 97 F.3d 1074, 1076 (8th Cir. 1996) (citing Poor Thunder, 810 F.2d at 821).

Ordinarily, the failure of a section 2255 movant to raise an issue on direct appeal acts to procedurally bar him or her from raising that issue for the first time in a motion pursuant to section 2255.[1] Matthews v. United States, 114 F.3d 112, 113 (8th Cir. 1997).

---

[1] The rule of procedural default applies with equal force to an adjudication of guilt based on a defendant's plea of guilty as it does to a court or jury conviction. See Reid v.

(continued...)

More specifically, as a result of a section 2255 movant's failure to raise an issue on appeal, the Circuit Court "cannot review his claims on their merits unless [the movant] is able to demonstrate either [1] cause for his default and actual prejudice, or [2] that the failure to consider his claims would result in a fundamental miscarriage of justice." McCall v. Benson, 114 F.3d 754, 758 (8th Cir. 1997) (citing Cole v. Thompson, 501 U.S. 722, 750 (1991)). The requirement of cause and prejudice means that a section 2255 movant "may not raise constitutional issues for the first time on collateral review without establishing both cause for the procedural default and actual prejudice resulting from the error." Apfel, 97 F.3d at 1076 (citing United States v. Frady, 456 U.S. 152, 167–68 (1982)). The "fundamental miscarriage of justice" exception to procedural default is "only available to a [movant] who demonstrates 'that a constitutional violation has probably resulted in the conviction of one who is actually innocent.'" McCall, 114 F.3d at 758. The rule of procedural default recognizes that the significant interest of finality in criminal cases retains strength only if the direct appeal remains the exclusive route for complaining of errors that demonstrate neither "a fundamental defect which inherently results in a complete miscarriage of justice, nor an omission inconsistent with the rudimentary demands of fair procedure." Id. at 821–22 (citing Johnson v. United States, 805 F.2d 1284, 1287 (7th Cir. 1986) (quoting Hill v. United States, 368 U.S. 424, 428 (1962))).

Once a court has decided the merits of all of the movant's claims which are properly before it, and has further determined whether the remaining claims may be excused from procedural default based on cause and prejudice, the court may analyze whether based upon a claim of actual innocence under the fundamental miscarriage of justice exception, the movant can avoid procedural default. See Dretke v. Haley, 541 U.S. 386 (2004). The actual innocence exception to procedural default "applies only when a [movant] shows by clear and convincing evidence that, but for the alleged constitutional error, no reasonable

---

[1](...continued)
United States, 976 F.2d 446, 448 (8th Cir. 1992) (applying the rule of procedural default after the defendant's knowing and voluntary plea of guilty).

juror would have found the petitioner guilty." Anderson v. United States, 25 F.3d 704, 706–07 (8th Cir. 1994). Furthermore, "[t]he exception only applies to claims of factual innocence as opposed to legal innocence." Id. at 707. Specifically, a movant claiming actual innocence must show: (1) that his allegations of constitutional error are supported by new reliable evidence that was not presented at trial; and (2) that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence. Weeks v. Bowersox, 119 F.3d 1342, 1351 (8th Cir. 1997). The fundamental miscarriage of justice exception is to remain rare and only be applied in the extraordinary case, reserved solely for those who are "truly deserving." Id. at 1351 (citing Schlup v. Delo, 513 U.S. 298, 321–22 (1995)). Accordingly, the actual innocence exception mandates "review of procedurally barred, abusive, or successive claims only in the narrowest type of case—when a fundamental miscarriage of justice would otherwise result." Id. (citing Bowman v. Gammon, 85 F.3d 1339, 1346 (8th Cir. 1996)).

### Standards for Judging Effective Assistance of Counsel

The Sixth Amendment right to counsel exists "in order to protect the fundamental right to a fair trial." Strickland, 466 U.S. at 684.

> [T]he right to effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial. Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated.

Lockhart, 506 U.S. at 364 (quoting United States v. Cronic, 466 U.S. 648, 658 (1984)). A criminal defendant is also entitled to effective assistance of counsel on a first appeal. Rogers v. United States, 1 F.3d 697, 700 (8th Cir. 1993); Estes v. United States, 883 F.2d 645, 648 (8th Cir. 1989).

Absent unusual circumstances, a section 2255 movant's demonstration of ineffective assistance of counsel satisfies the cause and prejudice standard of procedural default. Apfel, 97 F.3d at 1076. However, in order to successfully demonstrate ineffective assistance of counsel within the context of section 2255, the movant faces a heavy burden.

See id. at 1076.  In the context of a motion under section 2255, a claim of ineffective assistance of counsel is to be analyzed under the two-part test set forth in Strickland v. Washington.  The United States Supreme Court reformulated the Strickland test for constitutionally ineffective assistance of counsel in Lockhart v. Fretwell.  The Eighth Circuit's application of this test states:

> Counsel is constitutionally ineffective under Fretwell when: (1) counsel's representation falls below an objective standard of reasonableness; and (2) the errors are so prejudicial that the adversarial balance between defense and prosecution is upset, and the verdict is rendered suspect.

English v. United States, 998 F.2d 609, 613 (8th Cir. 1993) (citing Lockhart, 506 U.S. at 369–70).  Review of trial counsel's performance is deferential and the presumption is that trial counsel was competent and effective.  Strickland, 466 U.S. at 689; Smith v. Lockhart, 921 F.2d 154, 156 (8th Cir. 1990).  Reasonable trial strategy cannot rise to the level of ineffective assistance of counsel.  Id. (citing Stacey v. Solem, 801 F.2d 1048, 1051 (8th Cir. 1986)).  Counsel's strategic decisions "made after a thorough investigation of law and facts . . . are virtually unchallengeable," Strickland, 466 U.S. at 690, even if those strategic decisions prove unwise.  Wing v. Sargent, 940 F.2d 379, 381 (8th Cir. 1988), cert. denied, 489 U.S. 1088 (1989).  Representation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another.  Strickland, 466 U.S. at 693.

If a section 2255 movant fails to demonstrate ineffective assistance of counsel as cause for the procedural default and prejudice attributable thereto, he or she may not obtain review of the defaulted claim.  See Wainright v. Sykes, 433 U.S. 72 (1977).  In the context of ineffective assistance of counsel, "cause" for procedural default must ordinarily be demonstrated by showing that some objective factor external to the defense impeded counsel's efforts to comply with the applicable procedural rule or standard of conduct.  See Smith, 882 F.2d at 333 (citing Murray v. Carrier, 477 U.S. 478, 488 (1986)).  "When counsel's conduct has impeded the [movant's] effort to bring a claim," such ineffective

assistance of counsel constitutes "cause" for purposes of avoiding procedural default. See id.

In addition to establishing "cause," a section 2255 movant must "shoulder the burden of showing, not merely that errors at his trial created a possibility of prejudice but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." United States v. Frady, 456 U.S. 152, 170 (1982). Where conduct has not prejudiced the movant, the court need not address the reasonableness of that conduct. Id. at 691; United States v. Williams, 994 F.2d 1287, 1291 (8th Cir. 1993). To determine whether there is prejudice, the court examines whether the result has been rendered "unreliable or fundamentally unfair" as a result of counsel's performance. Lockhart, 506 U.S. at 364; West v. United States, 994 F.2d 510, 513 (8th Cir. 1993). Unreliability or unfairness does not result if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right to which the law entitles him. Lockhart, 506 U.S. at 372, quoted in West, 994 F.2d at 513. Prejudice does not exist unless "there is a reasonable probability that, but for counsel's . . . errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, quoted in Williams, 994 F.2d at 1291.

### Defendant's Specific Claims Against Tom O'Flaherty

The defendant was first indicted in case CR99-0037. The government charged him with the April 6, 1999, distribution of 12.61 grams of methamphetamine within 1,000 of All Saints Elementary School in southeast Cedar Rapids, Iowa. Attorney Tom O'Flaherty was appointed to represent the defendant upon the defendant's May 17, 1999, arrest. By order dated May 20, 1999, the defendant was detained.

Attorney Tom O'Flaherty filed a series of motions on the defendant's behalf. He filed an ex parte motion for investigative services (docket number 15), a motion to suppress statements (docket number 18), and a motion to dismiss the indictment, alleging that the informant lured the defendant to within 1,000 feet of a schoolhouse in order to enhance the defendant's potential punishment (docket number 20). Mr. O'Flaherty filed

a motion for an evidentiary hearing to determine the audibility and admissibility of the government's tape recording of the controlled transaction that occurred at the Sun Mart grocery store (docket number 22), and he filed another ex parte motion for expert assistance on July 9, 1999 (docket number 33). The motions to dismiss and to suppress were denied by Judge Melloy on July 22, 1999 and August 12, 1999 (docket numbers 37 and 39, respectively). The defendant filed a motion in limine on October 12, 1999, arguing that self-serving uncorroborated testimony of cooperating informant Lloyd Cinkan should not be admitted into evidence by the court (docket number 42).

On October 18, 1999, the government moved to continue the trial contending that it was unable to locate essential witness and cooperating informant Lloyd Cinkan (docket number 52). The motion detailed the efforts that had been made to locate the informant. That motion was granted on October 19, 1999 (docket number 54), and the time necessary for location of Mr. Cinkan was specifically excluded pursuant to the appropriate provision of the Speedy Trial Act. Mr. O'Flaherty objected to the continuance at a hearing held October 18,1999, at 2:50 p.m. (Tr. 3)[2] and at another hearing held later that day at 4:30 p.m. (Tr. 5). At a hearing held October 20, 2999, Judge Melloy was concerned about the fact of the defendant's detention and announced his intention to dismiss the case without prejudice. The following exchange took place:

| The Court: | I assume the Defendant has no resistance? |
|---|---|
| Mr. O'Flaherty: | No, your honor. |

(Tr. 3).

The defendant contends that Mr. O'Flaherty rendered ineffective assistance of counsel in case CR99-0037. It is a novel claim in its entirety because this Sixth Amendment guarantee protects the defendant at trial, sentencing, and on appeal. Only a few of the many claims of ineffective assistance of counsel alleged against Mr. O'Flaherty

---

[2] All references in this Report and Recommendation to (Tr. __) refer to the trial transcript except when, as here, the court specifically identifies another hearing.

have any bearing on the only trial that took place in the defendant's subsequent case, CR00-0025, with Attorney Clemens Erdahl representing him.

The defendant first contends that O'Flaherty failed to subject the informant's credibility to meaningful adversarial testing for impeachment purposes (Defendant's Brief 10). Specifically, he contends that:

> When effective counsel would have investigated Cinkan's credibility at the earliest opportunity possible and moved to dismiss the case with prejudice or alternatively move for trial and gained an acquittal.

(Defendant's Brief 13). This claim of ineffective assistance of counsel must fail for two reasons. First, there is no pretrial vehicle to test the strength of the government's evidence.

> An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor is enough, if valid on its face, to call for trial of the charge on the merits, and Fifth Amendment requires nothing more.

Costello v. United States, 350 U.S. 359 (1956). There is no motion that Mr. O'Flaherty could have filed that would have caused this matter to be dismissed based on the defendant's allegations that Mr. Cinkan's credibility was poor. Second, Mr. O'Flaherty filed a motion in limine in which he challenged the admissibility of uncorroborated testimony from Mr. Cinkan. See Defendant's Motion in Limine, docket number 42.

Defendant next contends that Tom O'Flaherty rendered ineffective assistance of counsel in failing to subject the April 6, 1999, controlled buy evidence to meaningful adversarial testing. Specifically, he claims that there was a breach of DEA protocol for a controlled buy because the informant had entered the Sun Mart on one occasion prior to being searched by the police. The defendant states:

> When counsel discovered the errors in this controlled buy, effective counsel would have moved for dismissal due to break in protocol.

This claim must fail for the same two reasons as his earlier claim. First, there is no mechanism to test the strength of the government's evidence before trial. The defendant

does not have a right to have the controlled buy transacted pursuant to any internal DEA protocol or standard.[3]  Second, the matters complained of by the defendant were, in fact, brought to the attention of the jury when this count was later incorporated in case CR00-0025.  Task Force officer Greg Brugman was examined (Tr. 352-53) and cross-examined (Tr. 355-56) at trial about this alleged break in protocol.

In his third claim, the defendant contends that Tom O'Flaherty was ineffective for failing to move for dismissal on the basis of the available evidence on July 13, 1999, when the case was originally set for trial.  As noted above, there is no vehicle for testing the strength of the government's evidence prior to trial.  The case could not have been reasonably tried on July 13, 1999, because the defendant had moved to suppress evidence and dismiss the case.  A hearing on the motion to suppress evidence was set on July 6, 1999 (docket number 32).  Therefore, the delay in the first  trial setting was due to the defendant's motions.  None of these actions by Mr. O'Flaherty even arguably implicate the defendant's Sixth Amendment protection.

The defendant contends that Tom O'Flaherty should have filed a motion challenging enhancement of his sentence due to his prior drug felonies.  A notice of enhancement was filed in case CR99-0037 on July 6, 1999 (docket number 31).  Of course, to constitute ineffective assistance of counsel, the defendant must show that the motion would have been granted.  The appropriate time to file such a motion would have been after the defendant was adjudicated guilty and prior to his sentencing.  Case CR99-0037 was dismissed and the defendant was not adjudicated guilty while Tom O'Flaherty represented him.  Further, as discussed below, the predicate offenses for sentencing enhancement were the subject of subsequent motions that were made, extensively litigated, and rejected.  Defendant's life sentence based on those predicate offenses was affirmed on appeal.  The defendant cannot

---

[3] See generally United States v. Simpkins, 953 F.2d 443, 445 (8th Cir. 1992) (Internal Department of Justice policies do not confer substantive rights on a criminal defendant.)

demonstrate that Tom O'Flaherty's conduct fell below the standard required by the Sixth Amendment, or that he suffered any prejudice from Mr. O'Flaherty's conduct.

The defendant contends that his right to a speedy trial were violated while Tom O'Flaherty represented him (Defendant's Brief 19). By this court's calculation, only 30 days had transpired on the speedy trial clock by the time the case (CR99-0037) was dismissed without prejudice. The defendant was arraigned on May 17, 1999, at which the government moved for his detention. That motion was granted on May 20. The time between the filing of a motion and its resolution is specifically excluded from consideration under the Speedy Trial Act pursuant to 18 U.S.C. § 3161(h)(1)(F). Between May 20, 1999, and July 8, 1999, 19 days elapsed under the Speedy Trial Act. However, on June 8, 1999, the defendant filed an ex parte motion for investigative services which tolled the speedy trial clock until the resolution of that motion on June 10, 1999. Following that resolution, 11 days elapsed until the defendant filed a motion to suppress statements on June 21, 1999 (docket number 18). That motion tolled the speedy trial clock until it was resolved on August 12, 1999 (docket number 39).[4]

On June 21, 1999, the defendant filed a motion for an evidentiary hearing to determine the audibility and admissibility of the government's tape recording. Judge Melloy stated that the motion would be taken up at the final pretrial conference, immediately before trial. That time is excluded pursuant to 18 U.S.C. § 3161(h)(1)(F). Furthermore, the order continuing the trial excluded the delay attributable to the continuance due to a need for effective pretrial preparation. See Order dated August 13, 1999 (docket number 40). This time is excludable pursuant to 18 U.S.C. § 3161(h)(8)(A) and (B)(iv). Accordingly, a motion to dismiss for violation of the Speedy Trial Act would not have been successful. Judge Melloy denied this same motion on February 21, 2001

---

[4] All time between the filing of a motion and a hearing is tolled. Henderson v. United States, 476 U.S. 321, 329-30 (1986). After that, a magistrate judge has 30 days within which to file a report and recommendation. The district court has 30 days following objections to the report and recommendation in which to file an order. United States v. Blankenship, 67 F.3d 673 (8th Cir. 1995).

in case CR 00-0025, docket number 124. The defendant's Speedy Trial Act arguments were later rejected by the Eighth Circuit Court of Appeals. <u>United States v. Titlbach</u>, 339 F.3d 692, 698-9 (8th Cir. 2003).

The defendant next contends that Tom O'Flaherty rendered ineffective assistance of counsel in his failure to preserve and present exculpatory evidence (Defendant's Brief 21). According to Cinkan's trial testimony, the defendant sent Cinkan a letter from the Linn County Jail. (<u>See</u> partial trial transcript dated February 28, 2001 at 44). After that, Cinkan visited the defendant a couple of times. (<u>Id.</u> 45). Cinkan testified that he was very apprehensive about being labeled an informant in the community (<u>Id.</u>47) and that he had been assaulted on one occasion and threatened on another because of his status as an informant. (<u>Id.</u> 48). He testified that he talked to the defendant about his desire to get out of town and that the defendant made arrangements for him to be given an automobile so that he could leave. (<u>Id.</u> 49-50). The defendant was charged with obstruction of justice, but was acquitted of this count. Cinkan's testimony made it clear that he had originated the idea of not appearing for the trial. (<u>Id.</u> 52-53).

The defendant contends that all conversations between visitors and detainees at the jail are recorded. According to the defendant, the jail should have tape recordings of their conversations in which the defendant contends that Cinkan made exculpatory admissions concerning the defendant. The defendant further contends that the Sun Mart grocery store had surveillance cameras from which Mr. O'Flaherty could have proved that Cinkan planted drugs in the grocery store and used them to frame the defendant. Finally, he claims that Mr. O'Flaherty was ineffective to failing to anticipate codefendant Joseph Anderson's suicide and for his failure to pursue a written notarized affidavit from codefendant Anderson concerning exculpatory evidence that could have been presented at trial.

There is no evidence to suggest that the items requested by the defendant were recorded by Sun Mart or the Linn County Jail.[5]   Attorney O'Flaherty cannot be responsible for failing to anticipate a codefendant's suicide.   The Court of Appeals ruled that there is no indication that Anderson would have provided exculpatory information. Titlbach, 339 F.3d at 699-700.   Accordingly, the defendant cannot demonstrate prejudice.

The defendant contends that Attorney Tom O'Flaherty rendered ineffective assistance of counsel in failing to make an argument for a dismissal of case CR99-0037 with prejudice.   The case was dismissed without prejudice on the government's motion, due to the unavailability of Lloyd Cinkan to testify at trial as scheduled in October 1999. Specifically, the defendant states that "Counsel should have argued against presenting this witness in light of his propensity to lie. . . ."   He contends that there were not grounds for the first continuance of the trial in July 1999, and that there was a speedy trial violation by October of 1999.   Finally, he contends that Mr. O'Flaherty was ineffective in his failure to inform the defendant of what a dismissal without prejudice meant.   "This failure led movant to believe that if he were released, there would be no further charges." (Defendant's Brief 29).

Again, as noted above, the defendant cannot show that an argument concerning the credibility of the informant would have caused Judge Melloy to dismiss this case with prejudice.   The court required the prosecutor to make an extensive record concerning efforts to locate the witness.   See Transcripts of hearings held October 18, 1990, at 2:50 p.m. and 4:30 p.m.   A motion to dismiss with prejudice at that point was exceedingly unlikely to prevail for the precise reason that no one knew at that time why Cinkan was unavailable.   It is highly unlikely that a judge would dismiss a case with prejudice absent such evidence because the unavailability of the witness may have been caused by the defendant.   In this case, the government alleged that the witness was unavailable due to

---

[5] A decision from Chief Judge Bennett shows that as of 2000 the Linn County Jail was not routinely recording telephone calls by prisoners.   United States v. Johnson, 196 F. Supp. 2d 795, 807 (N.D. Iowa 2002).

witness tampering by the defendant. A grand jury found probable cause to believe this allegation and the defendant was indicted for witness tampering. The defendant simply cannot demonstrate that a motion to dismiss this case with prejudice would have been successful. In fact, the motion was later made in case CR 00-0025 (docket number 127) and rejected by Judge Melloy.[6] Instead, his attorney did exactly what he should have done, he vigorously opposed any continuance of the trial.

With the benefit of hindsight, the defendant contends that Task Force Officer George Aboud knew or should have known that Lloyd Cinkan was taking classes and could have been found at school one night each week. Of course, the defendant does not have evidence that Cinkan was actually at school on any particular evening in October 1999. Further, the prosecutor, Stephanie Rose, indicated at the 2:50 p.m. hearing on October 18, 1999, that the police believed that they would be able to find him, that they had gone to all of the obvious places, and that he had apparently changed addresses (Tr. 2). Ms. Rose made an elaborate record at 4:30 p.m. on October 18, 1999, as to the efforts made to locate Cinkan. Again, the defendant comes up short when suggesting ideas in hindsight about how to find Cinkan, without providing any evidence that such efforts would have been successful. Finally, the defendant suffered no prejudice as a result of his alleged failure to comprehend the difference between a dismissal without or without prejudice.

## Defendant's Specific Claims Against Raphael Scheetz

On April 13, 2000, the grand jury returned a four-count indictment in case CR00-0025. The defendant, Susan Titlbach, and Joseph Anderson were charged with a conspiracy to distribute and manufacture 50 grams or more of actual (pure) methamphetamine between 1998 and 2000. Count 2 charged only Joseph Anderson. Count 3 again charged the April 6, 1999, distribution to Lloyd Cinkan at the Sun Mart grocery store. Count 4 charged that the defendant and Joseph Anderson obstructed justice by causing Lloyd Cinkan not to be available for the trial in case CR99-0037. The

---

[6] The Court of Appeals found no bad faith in requesting continuances. Titlbach, 339 F.3d at 699.

defendant was arrested and brought before the court on June 1, 2000. Attorney Raphael Scheetz was appointed to represent him on June 7, 2000. The defendant was again detained pending trial. Raphael Scheetz moved to withdraw as counsel for the defendant on November 27, 2000 (docket number 83), because the defendant retained Clemens Erdahl to represent him.

The defendant first contends that Mr. Scheetz was ineffective for failing to file a motion to sever Counts 3 and 4 from Counts 1 and 2. Specifically, he argues:

> Scheetz knew, or should have known, that Counts 3 and 4 of the instant Indictment should have been severed from the conspiracy case, and the bad faith motion should have been challenged to restart the speedy trial clock and move for a "with prejudice" ruling on Count 3. As to Count 4, counsel should have filed a motion for a dismissal. . . .

(Defendant's Brief 33). Federal Rule of Criminal Procedure 8(a) provides:

> **Joinder of Offenses.** The indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged -- whether felonies or misdemeanors or both -- are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan.

Offenses are of the same or similar character if they refer to the same type of offenses occurring over a relatively short period of time and have overlapping evidence. United States v. Ruiz, 412 F.3d 871, 886 (citing United States v. Boyd, 180 F.3d 967, 981 (8th Cir. 1999)). Obstruction of justice counts are properly joined under Rule 8(a) with the underlying offenses giving rise to the alleged obstruction. United States v. Little Dog, 398 F.3d 1032, 1037 (8th Cir. 2005).

The offenses in the indictment were properly joined and the defendant cannot show that a motion to sever them would have been successful. The conspiracy alleged that Ronald Titlbach, Joseph Anderson, and Susan Titlbach conspired between 1998 and April 2000 to distribute 50 grams or more of methamphetamine and to manufacture 50 grams or more of actual methamphetamine. Count 2 charged only Joseph Anderson, whose

December 2000 death mooted that charge. Count 3 charged the Sun Mart distribution of methamphetamine by Ronald Titlbach on April 6, 1999. Count 4 charged Ronald Titlbach and Joseph Anderson with obstruction of justice relating to the unavailability of Lloyd Cinkan for the October 1999 trial. The defendant does not make a cogent argument as to why the counts should have been severed. He cannot show that such a motion would have been successful.

The defendant further claims that Mr. Scheetz was ineffective for his failure to file a motion to dismiss pursuant to the Speedy Trial Act. A motion to dismiss was filed by Clemens Erdahl on December 29, 2000 (docket number 93), and the motion was resolved against the defendant on February 21, 2001 (docket number 124). That decision was affirmed on appeal. Accordingly, the defendant cannot show that he was prejudiced because it is certain that such a motion would have been unsuccessful.

Similarly, the defendant claims that Mr. Scheetz should have filed a motion to dismiss Count 3 with prejudice in case CR00-0025 because he believes it should have been dismissed with prejudice when it was filed as Count 1 in case CR99-0037. However, that motion was filed on February 22, 2001, by Clemens Erdahl (docket number 127). The court reserved ruling on this motion on February 23, 2001 (docket number 133) and denied the motion on March 6, 2001 (docket number 140). Under these circumstances, the defendant cannot show prejudice.

Finally, the same is true with the claim that Mr. Scheetz should have filed a motion to dismiss the obstruction of justice count, Count 4. Again, as noted above with respect to the alleged errors of Tom O'Flaherty, there is no procedural vehicle for testing the strength of the government's evidence prior to trial. The government had evidence that the defendant assisted Cinkan's unavailability by arranging for him to get a car. The motion to dismiss would not have been successful. In fact, Clemens Erdahl made such a motion at trial (Tr. 603) and the court refused to grant it (Tr. 604) even though the court gave the motion some consideration (Tr. 694-97). It is obviously difficult to make a claim

of ineffective assistance of counsel on a count of an indictment for which the defendant was acquitted.

Finally, the defendant contends that Mr. Scheetz rendered ineffective assistance of counsel by failing to conduct discovery. Mr. Scheetz testified at length on June 18, 2001 about the discovery materials that he had received from Mr. O'Flaherty, Mr. O'Flaherty's investigator, Mr. Titlbach's son's attorney, and the transcripts he had reviewed from Mr. Titlbach's earlier case. Mr. Scheetz then visited the government's discovery file on three occasions (Tr. 25-6). The record clearly demonstrates Mr. Scheetz's diligence in retrieving and reviewing discovery. The defendant cannot demonstrate prejudice, however, because Mr. Scheetz did not try the case. The point of discovery is to prepare for trial and because the defendant retained Clemens Erdahl, Mr. Scheetz did not try the case.

## Defendant's Specific Claims Against Clemens Erdahl

The defendant makes many claims of ineffective assistance of counsel against Clemens Erdahl. He claims that Mr. Erdahl should have secured access to sealed motions filed by codefendant Susan Titlbach. The certificates of service on some of these motions show that they were served on defendant's attorney. The defendant cannot demonstrate prejudice precisely because he does not know what is in the sealed motions. These sealed motions consist primarily of mundane things such as requests for issuance of subpoenas and other things that had no bearing on whether this defendant received effective assistance of counsel.

The defendant makes the same claim about Mr. Erdahl's failure to gain a severance from the other defendants. As noted above, the defendant cannot show that such motions would have been successful. Fed. R. Crim. P. 8(b) provides:

> Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or

> separately and all of the defendants need not be charged in
> each count.

When joinder of defendants is proper under Fed. R. Crim. P. 8, a motion to sever

defendants is an appeal to the court's discretion under Fed. R. Crim. P. 14. The rule

states as follows:

> If it appears that a defendant or the government is prejudiced
> by a joinder of offenses or of defendants in an indictment or
> information or by such joinder for trial together, the court may
> order an election or separate trials of counts, grant a severance
> of defendants or provide whatever other relief justice requires.
> In ruling on a motion by a defendant for severance the court
> may order the attorney for the government to deliver to the
> court for inspection *in camera* any statements or confessions
> made by the defendants which the government intends to
> introduce in evidence at trial.

Fed. R. Crim. P. 14.

The Eighth Circuit Court of Appeals has consistently indicated that persons charged

in a conspiracy or jointly indicted on similar evidence from the same or related events

should be tried together. United States v. Beasley, 102 F.3d 1440, 1448 (8th Cir. 1996).

"Where codefendants are charged with the same crimes, including conspiracy, and the

crimes of the codefendants will be proved by the same evidence, joint trials are generally

favored." Id. "[N]ot every defendant joined must have participated in every offense

joined." United States v. Delpit, 94 F.3d 1134, 1142 (8th Cir. 1996).

Rules 8 and 14 are read in favor of joiner and "[t]he presumption against severing

properly joined cases is strong." Delpit, 94 F.3d at 1143. Under Rule 14, the district

court has the discretion to determine the risk of prejudice to a defendant and the

appropriate remedy. Zafiro v. United States, 506 U.S. 534, 541 (1993).

> [W]hen defendants properly have been joined under Rule 8(b),
> a district court should grant severance under Rule 14 only if
> there is a serious risk that a joint trial would compromise a
> specific trial right of one of the defendants, or prevent the jury
> from making a reliable judgment about guilt or innocence.

Id. at 539. "Severance is not required merely because evidence which is admissible only against some defendants may be damaging to others. . . ." Delpit, 94 F.3d at 1144. Moreover, "defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." Zafiro, 506 U.S. at 540.

The defendant must show "clear prejudice" by the denial for severance. United States v. Leuth, 807 F.2d 719, 730 (8th Cir. 1986). "Severance is necessary where the proof is such that a jury could not be expected to compartmentalize the evidence as it relates to separate defendants." United States v. Rodgers, 18 F.3d 1425, 1432 (8th Cir. 1994). When there is some risk of prejudice by joinder, courts have consistently held that proper jury instructions can cure the risk of prejudice. Zafiro, 506 U.S. at 540; Rodgers, 18 F.3d at 1432. Using this standard, any motion to sever would not have been successful. The defendant cannot show prejudice.

He suggests that Mr. Erdahl should have objected to Division of Criminal Investigation (DCI) chemists' reports that were admitted without the testimony of the chemists who authored them. It is well settled that such a procedure is appropriate. United States v. Baker, 855 F.2d 1353, 1359 (8th Cir. 1988). Furthermore, it is sound strategy for a defense attorney to not call government chemists whose testimony is almost always very professional and difficult to effectively cross-examine. The defendant did not present any defense that suggested that the drugs at issue were not, in fact, methamphetamine. Instead, the defendant denied that a conspiracy existed and that he was a part of it. Further, with respect to the controlled buy at the Sun Mart, the defendant did not contend that the drugs were not methamphetamine. Rather, his defense was that the confidential informant's testimony could not be trusted. These strategic choices are the sort that were described in Strickland as "virtually unchallengeable." Strickland, 466 U.S. at 690.

The defendant contends that Mr. Erdahl failed to challenge the prosecution's link between the defendant and the Donald Kroeger fire. This simply is not true. In fact, Mr. Erdahl moved for a mistrial due to the defendant's contention that the government had

failed to link the defendant to that lab (Tr. 603). This theory was vigorously argued both at trial and on appeal. Titlbach, 339 F.3d at 697.

The defendant claims that Mr. Erdahl failed to pursue certain lines of discovery with respect to Rexanne Roberts and Donald Kroeger, but is unable to show how these materials would have caused the jury to acquit him. It should be remembered that the defendant is not claiming that he is innocent:

> Movant does not contest the fact that he manufactured "some" methamphetamine mostly for personal use. Movant does, however, contest that what he did manufacture was more than 50 grams of actual (pure) methamphetamine alleged in the indictment.

(Defendant's Brief 47).

The defendant makes a large number of allegations of ineffective assistance of counsel relating to the manner in which the jury calculated the drug quantity. The jury found that the defendant conspired to distribute and manufacture more than 50 grams of methamphetamine. (See Verdict Form, docket number 147). The issue was argued vigorously at trial and on appeal. Titlbach, 339 F.3d at 696. The defendant takes issue with computations of laboratory capability provided by chemist Nila Bremer. He contends that she should have based her calculations using smaller milligram ephedrine pills and a less efficient yields. He contends that Mr. Erdahl should have hired Dr. Raymond Grimsbo, who apparently would testify that 1000 twenty-five milligram ephedrine pills would produce 12.5 grams of methamphetamine (Defendant's Brief 45). A convenience store clerk, Brad Jensen, testified that he sold a case-and-a-half or more of ephedrine bottles to the defendant at a time (Tr. 332). A case-and-a-half cost approximately $700 and the defendant was purchasing between $700 and $1,100 of ephedrine at a time (Tr. 331). When asked over what period of time this activity occurred, Mr. Jensen testified

> Oh, at first I saw him maybe once or twice a month and then after we started getting larger quantities because we were selling quicker, I would see him maybe three or four times a

month, and that happened for maybe a five-month period and
then nothing.

(Tr. 336).[7] Even using the defendant's formula from Dr. Grimsbo, these quantities together with the 12.61 grams that he sold to the informant (Count 3) greatly exceed 50 grams of methamphetamine. The evidence showed hundreds of grams of pure methamphetamine[8] and the defendant is unable to demonstrate how any of his own theories would result in a finding of less than 50 grams of methamphetamine. Basically, the defendant contends that the jury should have rejected testimony that it accepted. This is not grounds for the ineffective assistance of counsel claim that the defendant has brought.

In his "shotgun" approach to his claims in this matter, the defendant further contends that Clemens Erdahl should have argued that the government only established a buyer/seller relationship between himself and various witnesses that did not amount to a conspiracy. While it is true that a buyer/seller relationship alone is insufficient to establish a conspiracy,[9] there is no suggestion here that such an argument would have prevailed. The jury also found the defendant guilty of a conspiracy to manufacture methamphetamine and the buyer/seller argument has no bearing on the conspiracy to manufacture 50 grams or more of methamphetamine.

---

[7] The defendant contends that Mr. Erdahl should have cross-examined Brad Jensen about the five-month period in 1998 when the defendant could not have purchased ephedrine at the convenience store due to the fact that the defendant was incarcerated. However, Brad Jensen's testimony was perfectly consistent with the defendant's incarceration. He testified he worked from the late fall or winter of 1998 until the fall of 1999. He testified that Ronald Titlbach purchased ephedrine for approximately a five-month period "and then nothing." (Tr. 336). After Jensen terminated his employment in the fall of 1998, he went back to the convenience store to visit his boss and observed the defendant purchase a large quantity of ephedrine. This is completely consistent with the defendant being incarcerated from May until October 1998.

[8] See Government's Brief 63-67.

[9] United States v. Pizano, 421 F.3d 707, 719 (8th Cir. 2005).

The defendant further contends that his attorney was obligated to "move for a new indictment" or to "strike every reference to Anderson" from the government's case in light of defendant Anderson's death and unavailability for trial. See Defendant's Brief 50. Because there is no such thing as moving for a new indictment and no theory under which evidence can be excluded at trial simply because it refers to someone who is dead, the defendant cannot demonstrate that such a motion would have been successful.

The defendant contends that those portions of the proceedings relating to his association with Lenora Shipp were fundamentally unfair. The defendant admits in his brief at page 51 that he accepts responsibility for 8.76 grams of methamphetamine and $2,600 in cash found in his possession in her car on May 31, 2000, However, the defendant wanted Mr. Erdahl to prove that the drugs and gun found in Ms. Shipp's possession were given to her by her brother in Oklahoma. He does not say how Mr. Erdahl was supposed to prove these facts, or what impact it would have had on the adjudication of his guilt, his sentencing, or appeal. He has again failed to demonstrate that Mr. Erdahl rendered ineffective assistance of counsel or that he was prejudiced by this conclusory statement that Mr. Erdahl should have proved that he had nothing illegal to do with Lenora Shipp.

Next, the defendant contends that Mr. Erdahl should have used motor vehicle title records to prove that an Arctic Cat Wave Runner was not traded to him for methamphetamine as a part of this conspiracy. An argument concerning a failure to transfer title to a vehicle transferred as a part of a drug deal would not likely have resulted in the defendant's acquittal. It is exactly this kind of argument that reasonable attorneys can forego when picking and choosing theories and strategy. The defendant's theory in his Section 2255 proceeding is as follows: "These were all easy enough questions for counsel to ask, but counsel failed to do so" (Defendant's Brief 53). The issue is not how difficult it was to ask questions but whether the defendant can show that the questions would have changed the outcome of the case. He cannot. Similarly, the defendant contends that Rexanne Roberts should have been called as a witness "to see what

prosecution was hiding" (Defendant's Brief 53). For the reasons set forth at page 58 of the Government's Brief, it is certainly reasonable to reject such a reason for calling a witness, especially Ms. Roberts.

## Defendant's Claims Against John Bishop

By July 2001, irreconcilable difference had arisen between the defendant and Clemens Erdahl. Mr. Erdahl moved to withdraw as counsel in July 2001 (docket number 196). Attorney John Bishop was appointed to represent the defendant. At that time, there were extensive motions on file challenging the government's notice to enhance the defendant's sentence with his 1999 drug trafficking conviction in Tama County. Sentencing was delayed pending resolution of the defendant's March 12, 2002, state court application for post-conviction relief with respect to the 1999 conviction. In fact, the defendant was released from federal custody for purpose of giving testimony in a post-conviction relief action in Tama County (docket number 255). No stone was left unturned in an effort to determine whether the defendant's sentence was properly enhanced by reason of his prior convictions. Mr. Bishop further made an Eighth Amendment argument challenging the imposition of a life sentence.

In his Section 2255 proceeding, the defendant now states that the appropriate avenue of defense was to challenge the prosecution's authority to seek and charge an offense with a statutory mandatory life sentence. The defendant's argument is set forth on pages 55 and 56 of his brief. The court simply does not understand it. As best the court can tell, the defendant is claiming that the United States Sentencing Guidelines "trump" mandatory minimum sentences in cases where they conflict. In fact, the opposite is true. U.S.S.G. 5G1.1(b); United States v. McCabe, 270 F.3d 588, 590 (8th Cir. 2001). The defendant cannot show that his argument about the authority to seek a mandatory minimum sentence of life imprisonment would have prevailed if made by Mr. Bishop.

## Alleged Prosecutorial Misconduct

The defendant contends that there were eight instances of prosecutorial misconduct in his cases. These include (1) the refusal to dismiss the Sun Mart controlled buy count after the informant visited the defendant in jail, (2) the refusal to dismiss that same count when the prosecution learned that the controlled buy at issue deviated from DEA protocol, (3) asking for an indictment charging distribution within 1,000 feet of a schoolhouse where the informant picked the buy location, (4) seeking a mandatory life sentence without statutory authority, (5) withholding the "proffer" of Rexanne Roberts, an eye witness at the scene of the Kroeger fire, (6) permitting convenience store clerk Brad Jensen to testify about events after the defendant was arrested, (7) making numerous false statements to the court and coaching witnesses, and (8) withholding impeachment evidence concerning witness Robert Symonds.

All of these claims were either raised on direct appeal or are procedurally barred. The defendant cannot show cause and prejudice for his failure to raise the matters that were not raised on direct appeal. Certainly he was aware of every one of them. Further, he does not cast them in terms of an ineffective assistance of counsel claim. As noted above, the defendant cannot show a fundamental miscarriage of justice because he does not claim actual innocence.

Aside from the procedural default, the claims of prosecutorial misconduct fail on the merits. Some of them lack factual support. There is absolutely no evidence that tape recorded conversations between the defendant and informant Cinkan ever existed. Similarly, there is no evidence that the prosecution withheld any particular witness statements including that of Rexanne Roberts. Other claims have absolutely no legal support. The defendant cites no authority and the court finds none to suggest that it is misconduct to continue a prosecution when an informant deviates slightly from the standards used by the police in a controlled buy situation. Similarly, no court has found that it is prosecutorial misconduct to charge a drug transaction as having occurred within 1,000 feet of a schoolhouse where the location was picked by the informant for reasons

similar to those present here. Finally, the defendant has a novel and meritless claim concerning the prosecutor's authority to seek enhancement of his sentence pursuant to 21 U.S.C. § 851. Because the argument is meritless, it cannot serve as the basis for a claim of prosecutorial misconduct.

The defendant contends that it was prosecutorial misconduct for the government to elicit testimony from Brad Jensen concerning events after the defendant was arrested. The court assumes that the defendant is talking about the five-month period between May and October 1998 when he was incarcerated. As noted above, the witness did not testify that the defendant purchased ephedrine during the time the defendant contends he was incarcerated. The defendant's claim about false statements to the court and coaching witnesses is completely unsupported. He does not even identify the witnesses or statements at issue. Finally, the claim that the prosecution withheld impeachment evidence concerning Robert Symonds has no merit. Two defendants were acquitted in cases wherein Robert Symonds testified. The defendant contends that Mr. Symonds should have been impeached with this fact. There is no theory of impeachment that permits someone to be discredited by evidence that they testified in a trial where a defendant was acquitted.

For the reasons discussed above, **IT IS RECOMMENDED**, unless any party files objections[10] to the Report and Recommendation within ten (10) days of the date of the report and recommendation, that the defendant's motion pursuant to 28 U.S.C. § 2255 (docket number 313) and his request for an evidentiary hearing (docket number 371) be denied.

October 18, 2006.

JOHN A. JARVEY
Magistrate Judge
UNITED STATES DISTRICT COURT

---

[10]Any party who objects to this report and recommendation must serve and file specific, written objections within ten (10) court days from this date.